**In re ASHEVILLE BUILDING ASSOCI-ATES, a Texas Limited Partnership, Debtor.**

**Bankruptcy No. A–B–88–10261.**

United States Bankruptcy Court, W.D. North Carolina.

Aug. 31, 1988.

Larry K. Hercules, Dallas, Tex., for debtor.

Joseph U. Schorer, Mayer, Brown & Platt, Chicago, Ill., for Carlyle Real Estate Limited Partnership—VIII and JMB Property Management Co.

James Gary Rowe,, Asheville, N.C., for Carlyle Real Estate Ltd. Partnership—VIII.

ORDER MODIFYING STAY

GEORGE R. HODGES, Bankruptcy Judge.

This matter is before the court on the motion of a secured creditor, Carlyle Real Estate Limited Partnership–VIII ("Carlyle"), for relief from the automatic stay in order to enforce its rights in its collateral. After considering all of the evidence and the argument of counsel the court concludes that the stay should be modified in the manner set out below.

*Background Facts*

1. On November 15, 1985, Carlyle executed a Deed of Trust (the "Carlyle Deed of Trust"), with respect to an office building known as the Northwestern Bank Building and Parking Garage (the "Property") located in Asheville, North Carolina, and a Note in the face amount of $3,000,-000.00 (the "Carlyle Note") in favor of Northwestern Bank.

2. Northwestern Bank has become First Union National Bank of North Carolina ("First Union") by merger.

3. On November 15, 1985, Carlyle sold the Property to the Debtor subject to the Carlyle Note and the Carlyle Deed of Trust, and the Debtor executed a Deed of Trust (the "Asheville Deed of Trust") and a Note in favor of Carlyle in the face amount

of $6,500,000.00 (the "Asheville Wrap Note").

4. Under the terms of the Asheville Deed of Trust, all rents and royalties generated by the Property were assigned to Carlyle. Carlyle perfected its interest in such rents and royalties on January 27, 1988.

5. The Debtor's sole business is to own and rent the Property, and the Property is the Debtor's sole asset.

6. During 1987, the Debtor was periodically in default of its obligations under the Asheville Wrap Note and continuously has been in default of its obligations under the Asheville Wrap Note since November 7, 1987.

7. During 1987, Carlyle started foreclosure actions twice after the Debtor failed to make payments on the Asheville Wrap Note. Carlyle dismissed both foreclosure actions after the Debtor brought payments current.

8. On December 15, 1987, Carlyle initiated foreclosure proceedings (the "Foreclosure Proceedings") for a third time against the Property in the Superior Court, Buncombe County, North Carolina (the "Superior Court").

9. On February 1, 1988, a notice was issued in the Foreclosure Proceedings setting a foreclosure sale on the Property for February 22, 1988, at noon.

10. On January 27, 1988, JMB Property Management Company ("JMB") was appointed receiver of the Property by order of the Superior Court.

11. JMB remains receiver for the Property. JMB is currently collecting rents and revenues generated by the Property.

12. The Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on February 22, 1988, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

13. On April 26, 1988, venue of this case was transferred to the Western District of North Carolina.

14. The Debtor has not filed a plan of reorganization.

15. More than 120 days has passed since the filing of the petition initiating this case, and the Debtor has not been granted an extension of the exclusivity period set forth in 11 U.S.C. Section 1121(b).

16. The Property consists of the 18 story building known as the Northwestern Bank Building and an associated parking garage both located in the center of Asheville. The building has about 153,000 useable square feet and is approximately 80% rented.

17. The Debtor and related entities experienced financial difficulties beginning shortly after the Property was purchased. As a result, much needed maintenance was deferred. Approximately $400,000.00 in needed maintenance has been deferred.

18. The condition of the Property has deteriorated since the Debtor purchased it in 1985 and further deterioration will certainly occur unless major problems are corrected. The deteriorating conditions include:

a. The roof leaks. It is beyond further repair and must be replaced. Water leaks into the 18th floor equipment room directly under the roof. In several places the water is deflected by make-shift internal gutters into steel barrels. The equipment room contains the building's fire and safety equipment, emergency generator, heat and air conditioning equipment and the computer for the elevator system. All of this equipment is jeopardized by moisture from the leaks. In fact, sixty percent of the air conditioning controls do not operate because of moisture damage. There is also leakage into the elevator shaft and water damage evident as far down as the 10th floor stairwell—eight floors below the roof.

b. The windows must be glazed. The caulking has deteriorated and is falling out, thereby permitting rain and wind to blow into the building. In many places the windows rattle when the wind blows.

c. The elevator needs major repairs. It does not level properly, does not dispatch to calls properly and doors open prematurely. It has been serviced only by the building engineer who is not licensed for elevator repair—notwithstanding that state and local codes require maintenance only by licensed contractors.

d. The boiler smoke stack has deteriorated by rust. It must be replaced before the boiler can be fired-up for heating—without which the building could lose its occupancy permit.

e. Carpeting in the main corridors is badly worn in places. A number of the bathrooms are in disrepair and have tiles that have fallen off and have not been replaced. Some repair is necessary to exterior walks and planters.

19. The building manager testified that she was unable to obtain needed funds for maintenance and service from the Debtor. Many vendors had cut off service because of non-payment by the Debtor. These included the gas company and the elevator maintenance contractor; and the power company had threatened to terminate service.

20. During the less than three years that the Debtor controlled the Property it declined from almost 90% occupancy to less than 80% occupancy. In addition a number of tenants had no signed leases and were on a holdover or month-to-month basis.

21. Carlyle commissioned an appraisal of the value of the Property by Thomas Steitler, a professional appraiser and MAI. Steitler conducted a proper and quite thorough appraisal of the Property using accepted methods—cost, market and income approaches. The values of the Property he established are as follows: Cost approach —$6,420,000.00; market approach—$6,630,000.00; and income approach—$6,050,000.00. He concluded that the value of the Property was best evidenced by the income approach.

22. Carlyle has a written agreement for the sale of the Property (contingent on obtaining relief from the stay) for cash of $6,840,000.00.

23. The Debtor's current indebtedness to Carlyle is $7,237,945.00. Interest is accruing on this debt at the rate of approximately $57,000.00 per month (or about $1,900.00 per day). The Debtor's only secured creditor is Carlyle. The debtor has approximately $120,000.00 in unsecured debts.

*Discussion*

24. Section 362(d) of the Bankruptcy Code provides for relief from the automatic stay (1) for cause and (2) where the debtor has no equity in the property and it is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(1) and (2). The court has concluded that Carlyle is entitled to relief from the stay on both bases.

*Relief for Lack of Equity and Necessity for Reorganization:*

(A) Equity in the Property:

■ 25. The competent evidence demonstrates that the Debtor has no equity in the Property. The Debtor owes Carlyle $7,237,945.00 and the highest competent evidence of the Property's value of $6.8 million.

26. The court finds Steitler's appraisal to be thorough and reliable. It was prepared in accordance with professional standards and methodology and based on reasonable assumptions. The Debtor was unable to demonstrate any serious flaw in the appraisal. The court is convinced by the testimony of the expert appraiser that the value of the Property is in the range he determined—$6,050,000.00 to $6,630,000.00.

27. The evidence of the contingent contract for sale for a cash price of $6.8 million is the best evidence of the value of the Property. Although higher than Steitler's appraised value, it actually confirms that appraisal. The $6.8 million offer was made by a group of people which includes large tenants of the building. That type of buyer is likely to offer a premium for the building because of factors that do not apply to other potential buyers—*e.g.* the ability to assure expansion space, control of space needs, prestige and the like. It would not have been proper for the ap-

praiser to base his opinion on such a potential sale because that market (and thus the likelihood of such a sale) was so limited. The fact that this premium offer price is so near the range of value given by the appraiser tends to support his opinion. In fact, the offer and the appraiser's opinion tend to confirm one another.

28. The Debtor has argued that Steitler's appraisal was a "joke," but the evidence does not support that. The Debtor has argued, *inter alia*, that the appraiser failed to consider the "100% location" of the building, the opportunity created by the vacancy rate, the proper gross rent multiplier, and the fact that the building now had a bank anchor tenant. From the appraiser's testimony and his report, the court is convinced that all relevant factors were considered by the appraiser and given their proper weight in his determination. The court finds none of the Debtor's criticisms of the appraisal to have merit or to affect the opinion of value of the Property in any significant way.

29. The Debtor offered no competing appraisal of the Property. Mr. Starnes, the principal of the Debtor, testified that the Property was worth $9 million, but he had no support for that figure. In fact, the figure might as well have been pulled "off the wall" for its evidentiary value. Mr. Starnes testified about two buildings he bought and then sold at multi-million dollar profits prior to his purchase of this Property. Those buildings were in Columbia and Greenville, South Carolina. They are in no way comparable to this building because of: significant differences in the markets (for instance, Starnes' own testimony was that rental rates were about three times higher in Greenville than Asheville); the buildings were about half the age of this Property; there was no evidence of deferred maintenance problems in the other buildings; and, significantly, those buildings were sold prior to the onset of the very conditions that have caused the Debtor's bankruptcy.

30. The Debtor has also asserted that the receiver has allowed the Property to continue to deteriorate when it could have performed the required maintenance—thereby increasing the value of the Property. Given the Debtor's history of operating this building, the court is reluctant to even consider such suggestions from that corner of the ring. But, considering that argument, the court finds that the receiver has managed the Property prudently and in the exercise of proper business judgment. The court finds no evidence of any effort to subvert the property for Carlyle's benefit.

31. JMB Property, JMB Realty (which executed the offer on the building) and Carlyle are all related. The court understands the Debtor's skepticism about these relationships, but there is no evidence of any improper relationship or actions on this record.

32. The evidence demonstrates that the Property is in real jeopardy of declining in value significantly because of the deferral of major items of maintenance. In fact, the building appears to be in violation of building codes and is in jeopardy of losing its occupancy permit when the heating season arrives.

33. From all of the above the court has concluded that the Debtor has no equity in the Property.

(B) Necessity for an Effective Reorganization:

34. The reorganization contemplated by 11 U.S.C. § 362(d)(2)(B) must be one that is "in prospect." *United Sav. Assoc. v. Timbers of Inwood Forest Assoc., Ltd.,* —— U.S. ——, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). It is the Debtor's burden to prove that there is a "reasonable possibility of a successful reorganization within a reasonable time." *Id.,* 108 S.Ct. at 632. The exclusive period for offering a plan of reorganization has elapsed and the Debtor has offered no plan. Mr. Starnes testified, without support, that he "believed" that the Debtor could reorganize and operate the building, but that he was willing to acquiesce to the desires of his partners (and his creditors) and sell the Property. Nothing the Debtor has offered demonstrates any realistic ability to sell the building in a reasonable time. And, nothing

shows that the Debtor is able to reorganize in order to operate the Property successfully.

35. The Debtor's first effort to sell the Property appears to have occurred a scant three weeks prior to the hearing on Carlyle's motion—and as many weeks after the 120 day exclusivity period. At that time the Debtor contacted officers of Kruse, Int'l. and Kruse Satellite Financial Services, Inc.—reputed to be one of the largest auction companies in the world. Mr. Peter Vescobo, of that organization, testified about his plan to auction the Property in late November at an "international satellite auction" that would be beamed to "150,000 pre-qualified buyers" in such farflung places as Tokyo, Zurich, Paris, Frankfurt, as well as in the United States and Canada. While this plan sounds impressive, it lacks substance. Mr. Vescobo had only met with officers of the Debtor ten days before. He had never been in this building and admitted that his inspection of the building consisted of driving around it in a cab on his way from the airport to the courthouse to testify. In such circumstances, this "Star Wars" marketing scheme cannot constitute a realistic plan to sell the Property for the benefit of creditors. In fact, the evidence demonstrates that the Debtor has made no real effort to market this Property.

36. Likewise, there is nothing in the history of the Debtor's ownership of this Property or in its plans that indicates an ability to reorganize so as to operate the building. The evidence of the Debtor's ownership prior to the receiver taking control is one of neglect, inability to perform needed maintenance, tenant loss, vendor loss and general deterioration of the building and tenant base. The Debtor's financial condition is such that it is not capable of providing the maintenance that the Property needs. The Debtor offered evidence of a semblance of a preliminary plan to operate the Property—but it required $600,000 to $800,000 new capital which the Debtor had no evidence of a realistic ability to supply—from itself or others. In short, the Debtor's plan is no more than "hope" and is not a realistic prospect for a successful reorganization.

37. *Timbers* held that more was required than merely showing that "if there is conceivably to be an effective reorganization, this property will be needed for it...." 108 S.Ct. at 632. That is the most that has been shown by the Debtor here—if even that much has been shown. Where, as here, the Debtor's "plan" lacks any "realistic prospect of effective reorganization" relief from the stay is merited. 108 S.Ct. at 633.

*Relief for Cause:*

■ 38. "Cause" exists here as an alternative (or cumulative) basis for granting relief from the automatic stay. First, there is a history of post-petition defaults in payment by the Debtor. Second, the history of neglect of the Property has rendered it into marginal condition. And, finally, as a result of deferred maintenance, the building is deteriorating to the point where it is in jeopardy of serious problems—including the possibility of losing its occupancy permit.

39. For all of the foregoing reasons, the court concludes that cause exists for granting Carlyle relief from the automatic stay.

*Miscellaneous Matters:*

40. Carlyle objected to the appearance of counsel for Central National Bank, Texas National Bank and the Imperial Palace Pension Fund all of whom are pledgees of the limited partnership interest of Mr. Starnes who is the sole general partner (and 90% owner) of the Debtor. There is authority for sustaining that objection. *See Roslyn Savings Bank v. Comcoach Corp.*, 698 F.2d. 571 (2d Cir.1983). Nevertheless, the court permitted counsel for these parties to participate fully in the hearing which resulted in this Order, if for no other reason than to avoid rehearing on account of his exclusion. Given the court's ruling here, it would appear that this issue is moot.

It is therefore ORDERED that:

1. The stay of 11 U.S.C. § 362 is *modified* to permit Carlyle to foreclose and sell the Property subject to the court's approval;

2. This court shall retain jurisdiction of this matter in order to approve or disapprove any sale of the Property; and

3. This Order is conditioned upon Carlyle's advertising the Property for sale in the *Wall Street Journal* for, at minimum, the number and timing of advertising required by the North Carolina General Statutes (the scope of this and other advertisement of the Property will be a factor that the court will consider in either approving or disapproving any sale of the property by Carlyle).

This decision was announced in court on August 19, 1988, and is entered this the 31st day of August, 1988.